Louis E. Whitham v. Commissioner. Rebecca M. Whitham v. Commissioner.
Whith v. . Comm'n
Docket Nos. 24972, 24973.
United States Tax Court
1951 Tax Ct. Memo LEXIS 294; 10 T.C.M. (CCH) 250; T.C.M. (RIA) 51075; March 16, 1951
Frank L. Scofield, Esq., and David L. Tisinger, Esq., for the petitioners. Allen T. Akin, Esq., for the respondent. LeMIRE Memorandum Findings of Fact and Opinion LeMIRE, Judge: The respondent has determined deficiencies in petitioners' income taxes for 1943 in the amounts of $16,863.59 for Louis E. Whitham and $16,828.74 for his wife, Rebecca M. Whitham. The year 1942 is also involved by reason of the forgiveness feature of the Current Tax Payment Act of 1943. The questions in issue, all of which relate to the determination of the distributable income of a partnership, L. E. Whitham & Company, in which the petitioners were equal partners, are as follows: (1) whether the payments which the partnership made in 1942 and 1943 under contracts for the use of certain construction equipment were rental payments or *295 purchase money payments; (2) the amount of depreciation allowable on equipment in 1942 and 1943; (3) whether the partnership sustained a deductible loss on the abandonment of a gravel plant in 1942; (4) whether losses sustained on the sale in 1942 and 1943 of vacant lots which the partnership had acquired by foreclosure of paving liens was a capital loss or an ordinary loss; (5) whether certain corporate stock owned by the partnership became worthless during 1943; (6) whether the partnership sustained a deductible bad debt loss in 1943; (7) the amount of income realized by the partnership in the construction of an army air base at Frederick, Oklahoma; and (8) whether the petitioners are entitled to an operating net loss carry-back from 1944 to 1943 and 1942 on account of net losses sustained by the partnership in 1944. General Findings of Fact The petitioners are husband and wife and are residents of Texas. They filed separate returns for 1942, 1943 and 1944, with the collector of internal revenue for the second district of Texas. During 1942 and 1943 petitioners were equal partners in a partnership known as L. E. Whitham & Company. The partnership conducted a general contracting *296 business. During 1942 and 1943 it was engaged primarily in the laying of concrete pavement. The partnership was organized in 1919. In 1934 it transferred all of its equipment to a wholly owned corporation, L. E. Whitham Construction Company. Both the partnership and the corporation continued in existence during the years involved. The partnership kept its accounts and made its returns on an accrual and a completed contract basis. Rental Payments on Equipment Findings of Fact: During 1942 and 1943 the partnership joined with several other contractors on certain government paving contracts in Texas and Oklahoma. There were separate written agreements between the partnership and its associates for each of the jobs, which varied somewhat as to the relationship of the contractors and their obligations. One of such agreements was entered into by the partnership and Austin Bridge Company on June 29, 1942, for paving an airfield at Pampa, Texas. It provided that Austin Bridge Company would finance the contract and that: "The Party of Second Part [the partnership] agrees specifically to furnish for an agreed price of $.334 per square yard on item 24, concrete pavement, and chargeable *297 as part of the cost of this contract, all equipment required to perform this contract, said price to include all rent, repair, fuel, move in and out, set up and installation of said equipment, also the furnishing of all tools and expendable supplies needed and required for this contract. This charge is intended to cover all charges as included in our estimate under items B, C, D and item F with the exception of $4,000.00 set up for Railroad Track Facilities and $600.00 set up for Field Office. During the term of this contract expenditures for equipment rental payable to third parties and cost of repairs shall be advanced from funds available for financing the said contract. Rent on equipment owned by L. E. Whitham & Company or L. E. Whitham Construction Company shall not be payable until final accounting is made of the proceeds from the said contract." The profits and losses were to be shared equally by the contractors. Neither party was to be entitled to any salary or allowance for personal expenses. On July 15, 1942, the partnership entered into agreements with Theo Montgomery on two separate contracts for paving Alamo Field and Duncan Field at San Antonio, Texas. Under these *298 agreements Theo Montgomery was to finance the contracts and the partnership was to furnish all "necessary equipment, personnel and supervision." Each agreement provided that: "During the term of this contract expenditures for equipment rental payable to third parties and cost of repairs shall be payable from funds available for financing said contract. Rent on equipment owned by L. E. Whitham & Company or L. E. Whitham Construction Company shall not be payable until final accounting is made of the proceeds of the said contract." Theo Montgomery was to receive all profits up to twenty-five cents per square yard of pavement laid and the partnership the balance, subject, however, to certain adjustments in the case of government renegotiation of the contracts. The losses, if any, were to be shared equally. Neither party was to draw any salary but each was to be allowed $8 per day for the time actually spent on the job, which was to be charged to job costs. By similar agreement dated August 1, 1942, the partnership joined two other contractors, Vilbig Construction Company and J. Lee and E. A. Vilbig, Inc., on a contract to pave an airfield, or a portion thereof, at Frederick, Oklahoma. *299 The Vilbig corporations, referred to hereinafter jointly as Vilbig, agreed to finance the contract and to pay all expenses of the work, while the partnership agreed to furnish all necessary equipment and personnel. Petitioner Louis E. Whitham was to receive a salary of $150 per week, which was to be charged to the cost of the work to be paid by Vilbig. Vilbig was to pay all labor and personnel and "* * * all charges for materials, supplies, tools, equipment, equipment repairs, taxes, including all local, county, state and federal taxes, insurance and bond premiums, and all other expenses, including equipment rental on equipment owned by third parties, but excluding equipment rental on equipment owned and furnished by SECOND PARTY [the partnership] * * *." Vilbig was to receive all of the profits up to thirteen cents per square yard of pavement laid and the partnership all in excess of that amount, subject to certain adjustments if the contract should be renegotiated. The losses, if any, were to be borne two-thirds by the partnership and one-third by Vilbig. As security for payment by the partnership of its share of any losses, Vilbig was to have the right to retain any or all *300 equipment which the partnership had used on the job. On July 7, 1943, the partnership entered into an agreement with Ottinger Brothers, of Oklahoma City, Oklahoma, to participate as a subcontractor on an airfield paving job at Dalhart, Texas. The partnership agreed to furnish all materials and to do all the work required in accordance with the prime contract. The job was required to be finished by October 15, 1943. Ottinger Brothers was to finance the contract, including the advancement of funds for the purchase of all "supplies, tools, repair parts, materials, services (other than payrolls) freight, transportation, insurance, equipment rental, taxes on payrolls or purchases, and any and all items properly and reasonably chargeable to the performance of the work." The partnership agreed to furnish, without cost, certain equipment of its own, a list of which was set out in the agreement. The list included tractors, scrapers, graders, rollers, steel road forms, pavers, finishers, cranes, and other items. The partnership represented that it owned such equipment free of any encumbrances. It was further agreed that: "The equipment required in addition to that listed above shall be acquired *301 by rental contract or otherwise, as mutually agreed upon between the Partnership and the Subcontractor, and all such expense of rentals, transportation, up-keep and operation shall be advanced by the Partnership to the Subcontractor as a part of its cost in performing this subcontract." The partnership was to receive as its compensation the entire amount specified in the prime contract for the work performed by it, less the amount advanced by Ottinger Brothers in financing the contract. Any losses on the contract were to be borne by the partnership and Ottinger Brothers equally. Actually, a loss of $85,000 was sustained on the contract and on January 3, 1944, the partnership transferred to Ottinger Brothers equipment valued at $42,500 in payment of its share of such loss. A settlement agreement was entered into by the parties which provided, in part, as follows. "In consideration of the transfer to Ottinger Bros. by L. E. Whitham & Co. of equipment valued at Forty-two Thousand Five Hundred and no/100 ($42,500.00) Dollars, as listed on a bill of sale dated January 3rd, 1944, L. E. Whitham & Co. is hereby released from further expense or obligation in connection with the performance *302 of the said subcontract. * * *
"L. E. Whitham & Co. releases to Ottinger Bros. all of its interest in the job, camp buildings and other salvage of tents, bedding, utensils and supplies from the construction camp, and relinquishes to Ottinger Bros. all claims to equity in the Rex Paver and Longitudinal Finisher and in the small tools and supplies still on hand or in use on the job, exclusive of office equipment. "L. E. Whitham & Co. shall receive title to all tools, repair parts and tires now in its possession, and relieves Ottinger Bros. of further expense for repairs to L. E. Whitham & Co. equipment and trucks, other than such items as may be already approved by written purchase order approvals." The partnership began reacquiring road building and paving equipment about 1941. Its books and records for 1942 and 1943 show various items of equipment, consisting of trucks, tractors, pavers, road forms, and other items having a total cost of $91,129.58. All of this equipment was acquired in 1942 and 1943, except two finishing machines acquired in 1941 at a cost of $7,600. This equipment was all acquired under rental agreements with options to purchase. The agreements all provided *303 that the lessee (the partnership) should have the option to purchase equipment at any time during the life of the equipment at the stated values and to apply the amounts paid as rentals to the sales prices. The contractors with whom the partnership was associated on the several jobs made most of the monthly payments on the equipment. These payments were charged to the cost of the particular job under construction at the time. The total amount of cash expended by the partnership in acquiring title to the equipment was $13,823.05. The partnership sold all of this equipment in 1944 at a total sale price of $53,209.92. The petitioners' books and records show the following figures as to the acquisition, use, and sale of the equipment: Cost per option agreements
$91,129.58
Depreciated value when option
exercised
60,568.16
Depreciation when owned by
taxpayer
23,133.66
Depreciated value when sold
37,434.50
Sale price
53,209.92
Net gain
15,775.42 The amount of $91,129.58, less the $13,823.05 paid by the partnership, or $77,306.53, was charged to expenses as a part of the cost of the jobs under construction when the payments were made. In his deficiency notices *304 the respondent determined that the so-called rental payments on the equipment made by others were improperly claimed as expense deductions by the partnership and should be restored to partnership income in the amounts of $42,253 in 1942 and $35,052.53 in 1943. Opinion: In their original petitions petitioners alleged as to each of the years 1942 and 1943 that respondent erred in disallowing deductions which the partnership had charged off as rental expenses on equipment. They filed amended petitions, alleging that the respondent erred "in disallowing deductions alleged to have been claimed as business expenses." These amendments were intended to put in issue the question as to whether the rental payments were ever claimed or deducted as business expenses by the partnership. Petitioners argue in their brief that: "The petitioners' partnership did not make rental payments on rented equipment used on joint adventure jobs in 1942 and 1943 and did not claim or deduct rental payments of $42,253 in computing the income of its partnership in 1942 and of $35,052.53 in 1943 as set forth in Respondent's letter of assessment. Respondent, therefore may not disallow a non-existent deduction and *305 increase petitioners' income correspondingly in 1942 and 1943 by the amounts set out above." The partnership return for 1942 shows: Income from completed contracts
$263,064.44
Income from Theo Montgomery
and L. E. Whitham & Co. (joint
adventure)
39,128.00
Cost of completed contracts
281,649.55
Net operating profit
20,542.89 Under other income the return shows: Equipment rentals charged
$ 38,260.62
Less: repairs to equipment
7,992.84
Depreciation for 1942
13,088.47
Net income
21,317.74 There were "Other Expenses" aggregating $18,366.75, making a net income of $2,950.99 which added to the operating income of $20,542.89 made a total net profit for 1942 of $23,493.88. In explanation of the $38,260.62 item the accountant who prepared the partnership return testified that that amount was charged into the cost of the jobs in process when the so-called rental payments were made and was, therefore, reflected in the item of $281,649.55 reported as "Cost of completed contracts," and that a like amount was reported in other income as "Equipment Rentals Charged" merely as a balancing entry. Actually, no rent was ever received by the partnership *306 for the use of any of its equipment. Whether the rental payments were intended to be reflected in the returns as deductions or as income, or both, are questions we do not need to determine here. Our question is whether the payments are properly includible in taxable income and, if so, whether they are deductible as expenses or cost of the completed contracts. It is now well settled that such payments made on contracts for the rental of equipment, with the option to purchase at the end of or during the rental period, are not deductible as business expenses, where the so-called lessee is expected to acquire ownership of the property at the end of the rental term and the payments are large enough to exceed depreciation and value and thus give the payor an equity in the property by reason of such payments. See Holeproof Hosiery Co., 11 B.T.A. 547; Judson Mills, 11 T.C. 25; Truman Bowen, 12 T.C. 446; Chicago Stoker Corp., 14 T.C. 441. If the payments on the equipment here had been made by the partnership out of its own funds, the cases cited would be controlling as to the right of the partnership to deduct them as business expenses *307 or part of the cost of the completed contracts. The fact that the payments were made for the most part out of funds furnished by the partnership's associates does not change that situation. The more difficult question is whether the payments are includible in the partnership's gross income. They were income to the partnership if they were paid for its benefit or as a part of the remuneration for the services which it performed under the contracts. In some of the contracts, those of the Austin Bridge Company and Ottinger Brothers, the rental payments were said to be "advanced" operating funds while in others they were said to be "payable from" or "paid" out of the operating funds furnished by the partnership's associates. However they were described in the agreements, it seems clear that the payments were all made on behalf of the partnership and for its benefit. The partnership contracted for the equipment in its own name, acquired title to it when the options to purchase were exercised, and later sold the equipment as its own property. It paid nothing to its associates on account of any interest that may have been had in the equipment. Some of the equipment, it is true, was assigned *308 to or retained by the associates after completion of the contracts, but this apparently was in satisfaction of the partnership's liability under the contracts for losses on the jobs and not because of any proprietary rights of the other contractors in the equipment. It may be that the contractors regarded the payments as rentals due the partnership for the use of its equipment, as indicated by the partnership's return for 1942, in which the payments were reported as "Equipment Rentals Charged," but however that may be, we think that the payments were includible in the partnership's gross income for those years. Petitioners concede that these payments aggregated $38,692.75 in 1942 and $38,612.78 in 1943. Depreciation Findings of Fact: The depreciation charged off against the equipment in the partnership books amounted to $30,561.42 up to the time when the options to purchase were said to have been exercised and $23,133.66 from then to the date of the sale of the equipment. The rates at which the depreciation was computed vary on different types of equipment, ranging from 16.23 per cent on some items to 50 per cent on others. There were three different lots of trucks, consisting *309 of ten Chevrolet trucks acquired in January 1942, ten more acquired in September 1942, and ten Dodge trucks acquired in September 1942. These trucks were all depreciated at the rates of 35 per cent in 1942 and 50 per cent in 1943. The trucks were all new when acquired. Some of the other equipment, particularly of the heavy type, had been in use for periods of from one to ten or eleven years when the partnership acquired it. Generally, the partnership used its equipment until it was completely exhausted and had no remaining value except for salvage. The trucks were subject to unusually hard usage in 1942 and 1943. Opinion: It follows from our ruling next above that the partnership is entitled to depreciation deductions on the equipment which it purchased under the so-called rental option agreements from the date of its acquisition. The parties appear to be in agreement as to the quantity and cost of the depreciable assets on which the partnership is entitled to compute its depreciation for the years involved, except as to the date of acquisition of that acquired under the rental option contracts, but they are in disagreement as to the rates and as to the adjustment of the basis *310 for salvage value. The respondent applied the so-called standard rates, as set out in Bulletin F, after adjusting the cost basis by the amount of the estimated salvage value of the equipment. Petitioners contend, first, that no such adjustment of basis should be made because the partnership used all of its equipment until it was completely worn out and had no remaining salvage value. They contend, as to the rates, that the equipment was all subject to abnormally hard usage during 1942 and 1943 because of the war emergency. They contend that the trucks especially suffered accelerated depreciation because of overloading and abuse by untrained drivers. The evidence of record supports the petitioners' contention as to the salvage value and in part as to the rates. The evidence is that the partnership made a practice of using its equipment as long as it was of any service and then abandoning or selling it for junk for whatever price could be had. As to the depreciation rates, several witnesses testified that the trucks, especially, were put to unusually hard usage because of the emergency under which the jobs were done and the scarcity of experienced drivers. The partnership was required *311 to use the trucks long hours, to overload them to twice their capacity or more, and to employ unskilled, incompetent drivers to handle them. We do not have sufficient evidence as to the usage or condition of any of the other specific items of equipment to overcome the prima facie correctness of respondent's determination. As stated, the parties are in agreement on the quantity and cost of the assets involved. The depreciation deductions on the trucks will be recomputed by allowing the rates claimed by the petitioners, that is, 35 per cent in 1942 and 50 per cent in 1943. As to the other equipment the standard rates will be applied, using a cost basis undiminished by any salvage values. Loss on Gravel Plant Findings of Fact: On paving jobs the partnership usually set up its own gravel plant near the job site. Its practice has been, since about 1930, to charge to the job under construction the cost of installing the gravel plant, less the salvage value of the equipment that was to be moved to another location. In 1938 the partnership owned two gravel plants which it carried in its books at an aggregate value of approximately $10,700. In that year Austin Construction Company *312 acquired the plants and moved them to Wichita Falls, Texas. It spent about $8,000 in moving and setting up the plant at the new location. The plant was operated by Austin Construction Company until the end of 1940 when the partnership reacquired it and began operating it on its own behalf. In 1942 the partnership moved the plant to Frederick, Oklahoma, to another job site. On reacquiring the plant from Austin Construction Company, the partnership set it up in its books at $10,000, which was its estimated value at that time. In 1942 it charged $5,000 of that amount to the production cost of the Wichita Falls job and on moving the plant to Frederick, Oklahoma, charged the remaining $5,000 to "aggregate production for 1942." In his deficiency notice for 1942 the respondent disallowed the deductions so claimed. Opinion: It is argued in petitioners' brief that $5,000 of the $10,000 gravel plant account should have been, and was intended to be, charged to the Wichita Falls job and the remaining $5,000 carried forward and charged to the Frederick, Oklahoma, job in keeping with the partnership's usual practice. The error alleged in the petition is "in disallowing a deduction of $10,000 *313 claimed by the partnership for loss of value of a sand and gravel plant." In his deficiency notice the respondent stated that the $10,000 deduction claimed was disallowed "for lack of substantiation either as to basis or as to fact of loss." On the evidence before us, no deduction whatever can be allowed for the gravel plant. It is not shown what cost the plant had to the partnership. Any deduction, either as a loss or as a business expense, would have to be based on cost to the partnership. There is evidence as to the cost of the plant to Austin Construction Company from whom the partnership reacquired it in 1940, and as to its value at that time, but we do not know what, if anything, the partnership paid Austin Construction Company for it or what the partnership may have spent on the plant after its acquisition. In other words, there is no evidence that the plant had any cost basis to the partnership. In the absence of such evidence and in view of the fact that the respondent in his deficiency notice raised this specific question, the deduction claimed must be disallowed. Loss on Sale of Vacant Lots Findings of Fact: From time to time in the ordinary course of business the *314 partnership acquired title to vacant lots by foreclosure of paving liens which it had received in payment for improvements made to the properties. These lots were usually placed in the hands of local attorneys for sale and converted to cash as soon as a purchaser could be found. The paving liens were reported as income in the years when received. These liens, and lots after foreclosure, were sometimes used by the partnership in securing credit. The partnership sold some of the lots in 1942 at a loss of $673.98 and some in 1943 at a loss of $1,141.62. It deducted the losses in its returns for those years as ordinary losses. Respondent determined that they were capital losses subject to the restrictions imposed by section 117, Internal Revenue Code. Opinion: The dispute under this issue is whether the vacant lots which the partnership acquired by foreclosure of paving liens were capital assets within the meaning of the statute. Section 117 (a) (1) (A), Internal Revenue Code, excludes from the definition of capital assets "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." *315 We think that the lots in question were not capital assets. They were received by the partnership as income in the ordinary course of its paving business and, the evidence is, they were held for sale at all times. The partnership never acquired them or held them as investments. In fact, it acquired them unwillingly and only as a necessary means of collecting for the paving work which it had done. The paving liens, and the real estate parcels after foreclosure, were like the trade acceptances which the taxpayer received "as a necessary incident to the sale of its merchandise" in Hercules Motor Corporation, 40 B.T.A. 999, and the bonds which the taxpayer, a construction company, received for services performed in Joe B. Fortson, 47 B.T.A. 158. Lawyers Title Company of Missouri, 14 T.C. 1221. Loss on Riverdale Stock Findings of Fact: In 1929 the partnership purchased shares of stock in Riverdale Gin & Milling Company and Riverdale Mercantile Company at an aggregate cost of $5,880. These investments were made on the recommendation of an officer of the First National Bank of Goliad, Goliad, Texas, in which the petitioners were substantial stockholders. *316 The bank had made large development loans to the Riverdale interests. In 1943 it was forced to foreclose on the indebtedness and the assets of the companies were sold at public sale. The petitioners received nothing on their holdings and their stock in the companies became worthless in that year. The bank official who had advised the purchase of the stock wrote the petitioners that their investment had been lost by the foreclosure. The companies were later put into operation but petitioners have no interest in them and never have received anything on account of their investment in the stock. Opinion: In its return for 1943 the partnership claimed a deduction on account of investment in the Riverdale stocks of a long-term capital loss of $2,976.63. The respondent disallowed the deduction "for lack of substantiation." The evidence satisfies us that the partnership suffered the loss on the stock investment in question in 1943 as claimed and that it is entitled to a deduction in that year of such portion of the loss as is allowable as a long-term capital loss. Bad Debt Findings of Fact: Partnership claimed a deduction in its 1943 return for bad debts of $3,844.95. The respondent *317 disallowed the deduction "for lack of substantiation." In this proceeding the petitioners contest the disallowance of $2,937.55 of the total amount claimed, that being the balance of a debt said to have been due from Dr. A. C. O'Dell. The petitioners in 1935 lent $3,500 to Dr. O'Dell, the brother-in-law of Robecca M. Whitham, on his promissory note. The loan was for the purpose of having a well dug on Dr. O'Dell's farm, which adjoined petitioners' farm. The loan was reduced from time to time by dental services which Dr. O'Dell performed for the petitioners. In 1943 Dr. O'Dell told petitioners that because of bad health he would be unable to do any more dental work for them. In the meantime, he had had financial difficulties and had lost his farm. Opinion: Bad debt deductions are allowable under section 23 (k), Internal Revenue Code, for debts "which become worthless within the taxable year." The record before us is entirely lacking of proof that the debt in question became worthless within the taxable year 1943. The money was lent to Dr. O'Dell in 1935. He repaid some of it, we do not know when or how much, with dental services. The debtor lost his farm, presumably *318 on account of financial reverses, but we do not know when that occurred or what effect it had on his ability to pay the note. He told the petitioners in 1943 that he would be unable to do any more dental work for them because of ill health, but we do not know how long that condition may have obtained. The evidence does not show what efforts, if any, the petitioners made to collect the debt or whether the debtor had any assets out of which it might have been satisfied. For lack of evidence the respondent's disallowance of the bad debt deduction is sustained. Income From Frederick, Oklahoma, Air Base Job Findings of Fact: A dispute arose between the partnership and Vilbig over the profits from the Frederick, Oklahoma, paving contract mentioned above, and the partnership brought suit against Vilbig for an accounting. At the end of 1943 the partnership estimated that it would realize net income from that job of $51,397.89 and accrued that amount as income for the year 1943. In his deficiency notice the respondent raised the amount to $77,304.87. At the hearing it was stipulated that the amount finally received by the partnership under the court's ruling on the suit for an accounting, *319 less court costs, was $102.949.19. The following statement taken from the partnership books and records, it is stipulated, correctly shows the income and expenses for the entire contract, with certain exceptions which will be discussed later: Final judgment decreed by court
$103,759.11
Less one-half court costs
809.92
$102,949.19
Less allowable deductions: Items allowed by Agent Fisher: Theo Montgomery's share
$30,884.76
Bryant-Stewart's share (Contract)
8,500.00
Attorneys fees and costs
1944
7,270.69
Attorneys fees and costs
1945
2,176.07
Payroll 1943 - should be
1942
659.65
49,491.17
Additional expense paid out: Attorney Rowe $250.00
Attorney Chamberlin $250.00
Miscellaneous $26.80
1946
526.80
Attorney Nutt
1949
1,400.00
Settlement plant site damage, Lawhorn
1946
1,000.00
1947
900.00
3,826.80
L. E. Whitham Construction Co. share
Equipment rental as of
1943
6,000.00
Equipment rental as of
1945
2,644.58
Equipment rental as of
1949
2,217.87
10,862.45
64,180.42
Balance net income
$ 38,768.77 The figures on which the parties do not agree are the last three items of "Equipment rental" as of *320 1943, 1945 and 1949, aggregating $10,862.45. This was said to be L. E. Whitham Construction Company by the partnership for use of equipment owned by that corporation. Opinion: In view of the facts stipulated at the hearing, the only remaining difference between the parties on this issue is whether the so-called rentals of $10,862.45, which were charged against the Frederick job in 1943, 1945 and 1949 for use of equipment said to belong to the L. E. Whitham Construction Company, are proper expense charges. The 1945 and 1949 rental charges are said to relate back to 1943, the partnership making its returns on an accrual and completed contract basis. Petitioner Louis E. Whitham testified that these rentals were set up in the books of the corporation and the partnership and that the accounts were later balanced. On the evidence before us we can not determine that these were deductible expenses of any taxable year. We do not know what arrangements the partnership had with the corporation about the use of the latter's equipment, or what the equipment consisted of, or what use was actually made of it. In view of the close relationship between the partnership and the corporation, strict *321 proof is required on these matters. On the evidence before us we must sustain the respondent's contention that the so-called rentals are not deductible in determining the partnership's 1943 profits on the contract. Net Loss Carry-Back Findings of Fact: Prior to the issuance of the deficiency notices herein for 1943, petitioners filed claims or refund of the taxes paid in 1942, based on a net loss carryback from 1943 and 1944. The refund claims were not ruled upon by respondent but were made a part of the petitions in these proceedings, as directed by the respondent in his deficiency notices. The petitioners allege in their petitions, and the respondent denies, that: "The Commissioner erred in inferentially rejecting or disallowing the claim for refund which petitioner filed on Form 843 on or about October 2, 1945, with reference to the net amount of $2,701.12, which petitioner paid in income taxes for the calendar year 1942. * * *" In its 1943 return the partnership reported an ordinary loss of $41,249.46 and a longterm capital loss of $2,976.63. In its 1944 return it reported an ordinary loss of $34,406.15 and a long-term capital gain of $2,148.65. The partnership was *322 inactive in 1944. It sold all of its equipment early in that year. It reported $3,338.77 of gross profit from business, most of which was from the sale of sand and gravel, and interest of $3,882.34. Against that income it deducted expenses of $41,778.93, including an item "General Repair of Equipment," $23,745.60. In the computation of the long-term capital gain of $2,148.65, the partnership deducted a loss of $73,500 from the sale of 750 shares of the stock of L. E. Whitham Construction Company. The stock was sold to two of the partnership's employees, C. B. Bryant and V. M. Stewart, for $1,500. This left a gain on the sale of capital assets (equipment) of $5,085.59, from which was deducted a loss of $2,936.94 on the sale of real estate lots, leaving a net capital gain of $2,148.65, one-half of which, $1,074.33, was deducted in the partnership return. Opinion: Neither in their claims for refund nor in their petitions do the petitioners set out the amount of the alleged partnership net operating loss for 1944 which they claim as a carry-back to 1943 and 1942. They state that there were such losses for 1943 and 1944 in excess of the taxes for the combined years 1942 and 1943 and *323 that consequently the entire amount of taxes paid for 1942, amounting to $2,701.12, by petitioners, Louis E. Whitham, and $2,718.55 by petitioner, Rebecca M. Whitham, should be refunded. The year 1943 is before us in these proceedings and petitioners' tax liability for that year will be redetermined under Rule 50 in accordance with this opinion. The year 1944, however, is not before us and we do not know what final determination, if any, the Commissioner has made or will make of the partnership's income or of the individual income of the petitioners for that year. The revenue agent's report, which was put in evidence by counsel for the petitioners without objection, does cover the year 1944. It shows numerous adjustments for that year resulting in a net operating loss of $9,451.32, instead of $34,406.15 reported in the return, and a net capital gain of $11,291.06, instead of $2,148.65 as reported in the return. In computing the net capital gain the agent disallowed the partnership's claimed loss of $73,500 on the sale of the L. E. Whitham Construction Company stock. After a painstaking study of the evidence before us, we find that we are unable to make any determination, or even *324 a sound estimate, of the partnership's earnings or losses for 1944. The return itself, even if unchallenged, is not proof of any of the items contained in it. Neither is the revenue agent's report which, so far as the evidence shows, has not been adopted by the respondent and has been challenged by the petitioners who submitted it in evidence. Evidence has been adduced as to some of the items reported in the return but not all of them. The evidence as a whole indicates that the partnership may have sustained an operating loss for 1944 which petitioners may be entitled to use as a net loss carry-back in their individual returns for 1943 and 1942. We think that in fairness to both parties, and in the light of our rulings on the above issues, an opportunity should be given them to reach an agreement under Rule 50 as to the amount of the partnership's 1944 net operating loss, if any, which may be available to petitioners for a carry-back to 1943 and 1942, and that if they are unable to agree the proceedings should be set down for a rehearing on amended pleadings properly framing the issues upon which we must rule in determining those questions. It is so ordered. Cf. Birch Ranch & Oil Co., 13 T.C. 930. *325 Decisions will be entered under Rule 50.